UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWARD JOHNIGAN-BEY,

       Petitioner,

                              CASE NOS. 5:07-CV-10843
v.                                      5:07-CV-10844
                              JUDGE JOHN CORBETT O'MEARA
CATHERINE S. BAUMAN,[1]        MAGISTRATE JUDGE PAUL J. KOMIVES

       Respondent.
                               /

**CONSOLIDATED REPORT AND RECOMMENDATION**

*Table of Contents*

I.     RECOMMENDATION .................................................... 1
II.    REPORT ............................................................. 1
     A.    *Procedural and Factual Background* ............................ 1
     B.    *Standard of Review* ......................................... 10
     C.    *Evidentiary Claim (Claim I)* ................................ 12
         1.    *Clearly Established Law* ............................... 12
         2.    *Analysis* ............................................. 13
     D.    *Prosecutorial Misconduct (Claim II)* ........................ 16
         1.    *Clearly Established Law* ............................... 16
         2.    *Analysis* ............................................. 17
     E.    *Conclusion* ................................................ 19
III.   NOTICE TO PARTIES REGARDING OBJECTIONS ............................ 19

\*     \*     \*     \*     \*

I.    RECOMMENDATION: The Court should deny petitioner's applications for the writ of habeas corpus.

II.   REPORT:

A.    *Procedural and Factual Background*

       Petitioner Edward Johnigan-Bey is a state prisoner, currently confined at the Alger Maximum Correctional Facility in Munising, Michigan. Petitioner is incarcerated pursuant to two

---

[1] By Order entered this date, Catherine S. Bauman has been substituted in place of Jeri-Ann Sherry as the proper respondent in this action.

sentences of life imprisonment resulting from two separate but related convictions. In Case No. 07-10843, petitioner was convicted of first degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a); felon in possession of a firearm, MICH. COMP. LAWS § 750.224f; and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Wayne County Circuit Court, in connection with the murder of Larry Rogers. Petitioner was subsequently sentenced to a mandatory term of life imprisonment without possibility of parole on the murder conviction, a mandatory consecutive term of five years' imprisonment on the felony-firearm conviction, and a concurrent term of 38-60 months' imprisonment on the felon in possession conviction. In Case No. 07-10844, petitioner was convicted of felon in possession of a firearm following a trial before a separate jury, which occurred immediately following his trial in connection with the Larry Rogers murder. In this case, petitioner was charged with first degree murder and felony firearm in connection with the murder of Michael Moore, but the jury acquitted him of those charges and found him guilty only of felon in possession of a firearm. Petitioner was subsequently sentenced as a fourth habitual offender, MICH. COMP. LAWS 769.12, to a term of life imprisonment for this felon in possession conviction.

The evidence adduced at petitioner's trials, which was largely duplicative, was accurately summarized by the prosecution in its brief to the Michigan Court of Appeals and is recounted in respondent's answer:[2]

**TRIAL FOR . . . THE MURDER OF MICHAEL MOORE**

On the morning of September 18, 2002, two men, wearing black hooded

---

[2] For ease of reading, I have omitted from the following the citations to the record contained in the prosecutor's summary of the evidence, which are set forth in footnotes in the prosecutor's brief. The record citations can be found in respondent's answer, which quotes the same summary of evidence that I quote here.

sweatshirts, drove a stolen burgundy and gray 1992 Chevy Lumina van to Lemay Street. As Michael Moore was leaving his house at 5838 Lemay, the passenger of the van, armed with a high velocity AKC or SKS type rifle, jumped out and fired multiple gunshots into Michael Moore's back, killing him. Both men left in the van, drove a couple of blocks east to 5696 Fairview, where they torched and abandoned the van, before they fled in a blue or green car.

When the police arrived at the scene, they found Moore dead on the sidewalk, alongside seven spent bullet casings. They also found Moore's briefcase and sunglasses in front of his house, near a fired bullet.

Tyrone Traylor testified that Defendant made numerous admissions to him about the murder of Michael Moore, as well other criminal activities. Traylor explained that he and Defendant had been friends for more than 20 years. In 1989, Traylor and Defendant committed an armed robbery with a handgun for which they both pled guilty and served approximately twelve years in prison. During that time, Traylor and Defendant wrote to each other and remained friends. Traylor was released from prison on January 23, 2002, and Defendant was released on April 24, 2002. They made contact right away, and saw each other often, sometimes on a daily basis. Since Defendant did not have a means of transportation at first, Traylor drove him around.

Traylor testified that, one day at the end of April, or in the beginning of May, 2002, Defendant told him that some men had given him money to buy "tools," which meant guns. Defendant told Traylor that [he] was going to conduct contract murders, or "hits," in exchange for $10,000 per killing. Defendant said he was trying to get a crew together and asked Traylor if he wanted to be on the "team." Defendant told Traylor that he had list of people to kill and one of the names was a man named Mike. Traylor declined Defendant's request that he join him.

Traylor testified that, one day, Defendant took him by a house off of Highway I-94 and stated, "that's where ole boys live at." Traylor understood this to mean that "Mike" lived there. Sometime in June, Defendant drove Traylor past Joe Porter's Clothing store, where he said "Mike" worked." In the middle or the end of September, Defendant told Traylor that he "took care of that business" regarding Mike, and asked Traylor if he had seen anything in the news about it. Defendant recounted the details of the murder. He told Traylor that they drove up in broad daylight and "caught ole boy coming out, kick the door back, sprayed him with either his AK or his UZI, and drove off." Defendant told him that they drove the van around the corner and burned it up. Defendant said he had not yet received the $10,000.

In addition, Traylor testified that, sometime in August or September, 2002, he and Defendant were at Zachary Hearn's house on Hazlett. Other friends, including persons named Eric, Namon, and Dave, were also present. According to Traylor, Hearn offered Defendant $10,000 to kill Larry Rogers "over drugs." Defendant asked Traylor if he wanted to join him in killing Rogers, but Traylor, again, declined. In late October or early November 2002, Defendant told Traylor that he "took care of business for Zack." Defendant said that the murder occurred at night. He told Traylor

3

that he laid in the bushes, across the street. When "ole boy" came out the house and entered his car, Defendant ran up to the driver's side of the car, and "sprayed him" with an Uzi or a "Tech."

On October 26, 2002, the police responded to a shooting at the home of Larry Rogers, 6495 Colfax, in Detroit. They found Rogers, behind the wheel of his car, dead as a result of multiple gunshots. The police found 19 spent shell casings, and numerous bullet holes, along the driver's side of the car. The casings were fired from the same nine millimeter weapon, either a .9 carbine rifle or an Uzi. The victim, who was found with his keys in his right hand, still had on his wristwatch, a chain with a charm, a bracelet, and a ring.

The prosecutor presented Police Officer Marvin Redmond, who testified that back on April 11, 2002, he was working with Western Wayne Narcotics in undercover operations to purchase narcotics, when he arrested Larry Rogers. On August 22, 2002, as part of a plea bargain with the prosecutor's office, Rogers agreed to cooperate and become an informant. Through Rogers' cooperation, the police began conducting an investigation of Zachary Hearn.

Tyrone Traylor, further, testified that he was arrested on January 23, 2003 for a parole violation. He remained in custody until February 18, 2003, when the judge dismissed the case against him. Traylor testified that during the time he was in custody, he told the police about Defendant's statements that he murdered people for hire. Traylor maintained that he was never promised anything, nor did he ever receive anything, in exchange for the information against Defendant.

Traylor testified that, after his release from custody on February 18th, Defendant told him he was going to Grand Rapids because a man had been robbed and he had to go there to see about that situation. The following day, Defendant told Traylor that when he was in Grand Rapids, he had to shoot a man because he was concerned that the man knew Defendant's nick name was "Main." Traylor also relayed this information to police.

On February 19, 2003, the police arrested Defendant at 11030 Courville and executed a search warrant. The police recovered a .40 caliber Beretta, a SKS assault rifle, an Intertech Arms assault rifle, a .30 caliber carbine with a sawed-off stock, a Norinco assault rifle, two bulletproof vests, a flash suppressor, binoculars, an empty 50 round banana clip for an AK-47. The .30 carbine had two 30 round clips that were taped together and inserted into the weapon. The flash suppressor was in a suitcase long with the binoculars, the 50 round clip, and 40 rounds of 7.62 caliber ammunition, and two 30 caliber rounds. All the weapons were in working order.

The prosecutor presented evidence that, on February 7, 2003, the Kent County Sheriff's Department had responded to a crime scene at 8984 Thirteen Mile Road in Rockford, a city approximately 10 or 15 miles from Grand Rapids. There, they found Ean French, laying face down, just inside the door. It appeared that he had been killed three or four days earlier. French's legs and arms were bound behind him with duct tape. There was a wadded piece of duct tape on the floor, next to the victim. The police recovered 12 spent casings at the scene: six of the casings were .40 Smith and Wesson caliber, and the other six were .380 automatic calibers.

In cooperation with the Detroit Police Department, the Kent County Sheriff's Department executed a search warrant at Defendant's Detroit home, on March 5, 2003, and found rolls of duct tape in a kitchen drawer. A fracture comparison revealed the duct tape recovered from the French homicide scene came from one of the rolls of duct tape recovered from Defendant's kitchen. Furthermore, a scientific comparison revealed that Defendant's .40 caliber semi-automatic Beretta pistol was the weapon that fired the .40 caliber spent casings and the .40 caliber bullets recovered from the French homicide scene.

Finally, Defendant's cellular telephone records indicated that, on February 3, 2003, numerous calls were made from his cell phone. According to the records, the cellular towers receiving the transmissions indicated that at 8:00 a.m. a call was made from the vicinity of Defendant's home, in Detroit. Throughout the next several hours, the caller continued placing calls as he traveled from Detroit to Grand Rapids. The records showed several calls transmitted from the Grand Rapids area after 9:30 p.m. At 10:33 p.m., a phone call was made from Rockford, Michigan, the town where Ean French was killed. Thereafter, the records indicated that the caller traveled back to Detroit.

The parties stipulated that Defendant had previously be[e]n convicted of a specified felony and had not regained eligibility to use or possess a firearm.

The defense presented Tyrone Traylor's adult children, Tyrone Traylor Jr. and Toletha Traylor. They testified that Zachary Hearn was their mother's brother. Both testified that on February 18, 2003, after their father's release from jail, they went with Defendant to pick him up. Both testified that they never heard a conversation between Defendant and Traylor, Sr. where Defendant stated that he was going to kill somebody in Grand Rapids. Both of Traylor's adult children testified Traylor Sr. lived with their mother for a short time after his release from prison in 2002. Traylor Jr. testified that during that time he saw his father bring a Tech 9 into the house. Toletha Traylor testified that she saw her father bring a "Mag 10" into the house. Traylor Jr. also recounted that he saw his father with a .38 one day and that Traylor Sr. said he was not going back to jail and would have a "shoot-out" with the police if they came to get him. Traylor Jr. said that he had seen his father drive a blue Caprice recently. Finally, Traylor Jr. and Toletha Traylor testified that Traylor Sr. had a reputation for being untruthful.

Zachary Hearn testified that he did not sell drugs, nor did he hire anyone to kill Larry Rogers. He testified that he had many problems with Traylor in the past. Traylor had a reputation for being untruthful. Eric Hemmings, Zachary Hearn's cousin, who lived in Hearn's house, testified that he never heard Defendant talk about killing Larry Rogers. Further, he testified that Traylor had a reputation for untruthfulness and violence. David Williams, another cousin of Zachary Hearn's, testified consistent with Hemmings.

The jury found Defendant guilty of felon in possession only.

## TRIAL FOR . . . THE MURDER OF LARRY ROGERS

5

On October 26, 2002, as 55 year old Larry Rogers, of 6495 Colfax, Detroit, entered his 1989 Lincoln Continental and prepared to leave, someone approached the driver's side of his car with either a .9 carbine rifle or an Uzi, and fired at [least] 19 shots toward Rogers. Multiple gunshots entered Roger's head, killing him.

Tyrone Traylor testified that on January 23, 2003, he was arrested for a parole violation. During this period of time, Traylor told the police about incriminating admissions which Defendant had made to him. The district court dismissed Traylor's charges, after conducting a preliminary examination, and consequently, his parole violation was also dismissed. Traylor was released from custody on February 18, 2003. He testified that he made no deals, nor did he receive any benefits in exchange for his testimony against Defendant.

Tyrone Traylor testified that Defendant made numerous admissions to him about the murder of Michael Moore, as well as Larry Rogers and other criminal activities. Traylor explained that he and Defendant had been friends since they were in school. In 1989, Traylor and Defendant committed an armed robbery with a handgun, for which they both pled guilty and served approximately twelve years in prison. During the time they spent in prison, Traylor and Defendant maintained communications. Traylor was released from prison on January 23, 2002, and Defendant was released on April 24, 2002.

After their prison release, Defendant and Traylor saw each other frequently. Defendant did not have a car, so Traylor drove him around from place to place. Sometime in April or May 2002, Defendant told Traylor that a guy was giving him money to buys "tools" meaning guns. Defendant wanted Traylor to join him and be on the "team" to commit murders for money. Defendant told Traylor that there was a list of names and they would receive $10,000 for each murder. He also told Traylor that one of the persons on the list was "Mike." Traylor declined to join Defendant's team and tried to avoid Defendant. They still got together periodically.

Traylor testified that he did not know the man that Defendant called "Mike," but one day Defendant drove by a house by highway 1-94 and told him, "that's where ole boy lives at." Defendant also pointed to Joe Porter's men's clothing store and told Traylor that was where Mike worked. Sometime in late September or October 2002, Defendant told him that he "did that thing with Mike." Defendant told Traylor that he and Eligin Bright, "Fat Cat," rode up in a van, kicked the door back, sprayed "old boy," using either an Uzi or an AK-47. Afterward, they drove a few streets away and burned the van.

The evidence showed that, on the morning of September 18, 2002, two men, wearing black hooded sweatshirts, drove a stolen burgundy and gray 1992 Chevy Lumina van to Lemay Street. As Michael Moore was leaving his house at 5838 Lemay, the passenger of the van, armed with a high velocity AKC or SKS type rifle, jumped out, and fired multiple gunshots into Michael Moore's back, killing him. Both men left in the van, which they drove a couple of blocks east, to 5696 Fairview. There, they torched and abandoned the van, and fled in a blue or green car. When the police arrived at the scene, they found Moore, dead on the sidewalk, alongside seven spent bullet casings. They also found his briefcase and sunglasses, still in front

6

of his house, near a fired bullet.

Traylor also testified that, in the late summer or early fall of 2002, he and Defendant visited Zachary Hearn, on Hazlett. As Traylor stood around talking with Defendant and Hearn, and in the presence of others, Hearn offered $10,000 for someone to kill Larry Rogers. Hearn said that Rogers had to be killed because Rogers ran off with some "dope," and he was afraid that Rogers was going to talk to the police. Defendant asked Traylor if he was going to "help him take care of it or what." Traylor told Defendant and Hearn to leave it alone because too many people knew about it. Sometime in late October or in November, Defendant told Traylor that he took care of "that business." Defendant told him that he laid in the bushes across the street until "old boy' came outside, then, he went up to Rogers and "sprayed" him on the driver's side of the car, with an Uzi or a Tech 9.

Police Officer Marvin Redmond of Western Wayne Narcotics testified that, while he was working in an undercover operation to purchase narcotics back in April, 2002, he arrested Larry Rogers and confiscated almost a kilo of cocaine from his home. On August 22, 2002, as part of a plea bargain with the prosecutor's office, Rogers agreed to cooperate and become an informant. Through Roger's cooperation, the police began investigating Zachary Hearn.

Traylor testified that, after his parole violation was dismissed and he was released from custody, Defendant made additional incriminating statements to him, which Traylor, in turn, relayed to police. Traylor testified Defendant and Traylor's adult son and daughter met him at a barber shop after he was released from custody on February 18, 2003. Defendant told Traylor that he had to go to Grand Rapids because one of his friends had been robbed and he was going to see what it was about. The following day, Defendant told Traylor that he had to shoot some guy in Grand Rapids because the man knew Defendant's name was "Main."

On February 19, 2003, the police arrested Defendant at 11030 Courville and executed a search warrant. The police recovered a .40 caliber Beretta, a SKS assault rifle, an Intertech Arms assault rifle, a .30 caliber carbine with a sawed-off stock, two bulletproof vests, a flash suppressor, binoculars, an empty 50 round banana clip for an AK-47. The flash suppressor was in a suitcase long with the binoculars, the 50 round clip, and 40 rounds of 7.62 caliber ammunition, and two 30 caliber rounds.

A cooperative investigation between police departments revealed that, on February 7, 2003, the Kent County Sheriff's Department had responded to a crime scene at 8984 Thirteen Mile Road in Rockford, located northeast of Grand Rapids. The residence had been ransacked. The police found Ean French, laying face down, just inside the door. It appeared that he had been killed three or four days earlier. His legs and arms were bound behind him with duct tape. There was also wadded piece of duct tape on the floor, next to the victim. The police recovered 12 spent casings at the scene: six of the casings were .40 caliber Smith and Wesson, and the other six were .380 caliber, as well as three .40 caliber Smith and Wesson fired bullets.

The Kent County Sheriffs Department executed a search warrant at Defendant's Detroit home, on March 5, 2003, and found rolls of duct tape in (SIC) drawer. A fracture comparison revealed the duct tape recovered from the French

homicide scene came from one of the rolls of duct tape recovered from Defendant's kitchen. Furthermore, a scientific comparison revealed that Defendant's .40 caliber semi-automatic Beretta pistol fired the .40 caliber spent casings and the .40 caliber bullets recovered from the French homicide scene.

Finally, Defendant's cellular telephone records indicated that on February 3, 2003, there were numerous calls made from his cell phone. According to the records, the cellular towers receiving the transmissions indicate that at 8:00 a.m. a call was made from the vicinity of Defendant's home in Detroit. Throughout the next several hours, the caller continued placing calls as he traveled from Detroit to Grand Rapids. The records indicated several calls transmitted from the Grand Rapids area after 9:30 p.m. At 10:33 p.m., a phone call was made from Rockford, Michigan, the town where Ean French was killed. Thereafter, the records indicate that the caller traveled back to Detroit.

The parties stipulated that Defendant had previously been (SIC) convicted of a specified felony and had not regained eligibility to use or possess a firearm.

Zachary Hearn testified that he did not sell drugs, nor did he hire anyone to kill Larry Rogers, whom he described as a "good friend." He testified that he had many problems with Traylor in the past and that Traylor had a reputation for being untruthful. Eric Hemmings, Zachary Hearn's cousin, testified that he lived in Hearn's house during the fall of 2002. He stated that he never heard Defendant talk about killing Larry Rogers. Further, he testified that Traylor had a reputation for untruthfulness and violence, although he had never witnessed it himself. David Williams, another cousin of Hearn's, also testified that he never heard Hearn talk about wanting Larry Roger's killed.

The defense also presented Tyrone Traylor's adult children, Tyrone Traylor Jr. and Toletha Traylor. Both testified that on February 18, 2003, after their father's release from jail, they went with Defendant to pick their father up. Both testified that they never heard a conversation between Defendant and Traylor Sr. where Defendant stated that he was going to kill somebody in Grand Rapids. Both of Traylor's adult children testified Traylor Sr. lived with their mother for a short time after his release from prison in 2002. Traylor Jr. testified that during that time he saw his father bring a Tech 9 into the house. Toletha Traylor testified that she saw her father bring a weapon into her mother's house one time. Traylor Jr. also recounted that on one occasion he saw his father with a .38. Traylor Jr. claimed that his father said he was not going back to jail and would have a "shoot-out" with the police if they came to get him. Traylor Jr. said that he had seen his father drive a blue Caprice recently. Finally, Traylor Jr. and Toletha Traylor testified that Traylor Sr. had a reputation for being untruthful.

The jury convicted Defendant of first degree premeditated murder, felon in possession, and possession of a firearm during the commission of a felony.

Resp't's Answer, at 5-11.

Following his convictions, petitioner filed, through counsel, appeals of right in the Michigan

Court of Appeals. The appeals were consolidated, and petitioner raised through counsel two claims relating to both appeals:

> I. THE TRIAL COURT JUDGE ABUSED HIS DISCRETION IN ALLOWING HIGHLY PREJUDICIAL AND IRRELEVANT EVIDENCE OF UNRELATED WEAPONS AND A SEPARATE MURDER CHARGE WHICH WAS LARGELY IF NOT ENTIRELY OFFERED TO CORROBORATE THE TESTIMONY OF THE ONLY WITNESS AGAINST THAT THE [sic] PROSECUTION PRESENTED AGAINST DEFENDANT-APPELLANT AT TRIAL.
>
> II. THE PROSECUTOR ENGAGED IN GROSS MISCONDUCT BY ATTACKING THE CHARACTER OF THE DEFENDANT AND VOUCHING FOR THE CREDIBILITY OF HIS ONLY WITNESS AT TRIAL WITH EVIDENCE OF UNRELATED WEAPONS AND TESTIMONY SURROUNDING AN UNTRIED MURDER IN A SEPARATE JURISDICTION IN AN EFFORT TO CONVICT DEFENDANT AS A "HIT MAN" IN THE ABSENCE OF ANY REAL EVIDENCE TO SUPPORT DEFENDANT-APPELLANT'S PARTICIPATION IN THE MURDERS OF MICHAEL MOORE AND LARRY ROGERS.

In the appeal from the conviction involving the Michael Moore murder, petitioner raised an additional claim challenging his sentence:

> III. MR. JOHNIGAN'S SENTENCE OF LIFE IN PRISON FOR BEING A FELON IN POSSESSION OF A FIREARM REPRESENTS A DEPARTURE FROM THE LEGISLATIVE SENTENCING GUIDELINES WITHOUT SUBSTANTIAL AND COMPELLING REASONS FOR ANY DEPARTURE.

The Michigan Court of Appeals found no merit to petitioner's claims challenging his convictions on the basis of improper evidence and prosecutorial misconduct, and affirmed his convictions. *See People v. Johnigan*, 265 Mich. App. 463, 696 N.W.2d 724 (2005). However, the court of appeals found merit to petitioner's sentencing claim, and remanded the matter to the trial court for resentencing. Petitioner's application for leave to appeal to the Michigan Supreme Court was denied in a standard order. *See People v. Johnigan*, 474 Mich. 934, 706 N.W.2d 20 (2005).

Petitioner was subsequently resentenced. The trial court reimposed a sentence of life imprisonment on the felon in possession conviction arising from the Moore murder trial, explaining its reasons for departing from the guidelines. This resentencing was upheld on subsequent appeal. *See People v. Johnigan*, No. 267727, 2007 WL 704926 (Mich. Ct. App. Mar. 8, 2007), *application for leave to appeal den.*, 480 Mich. 886, 738 N.W.2d 229 (2007).

On February 26, 2007, petitioner, proceeding *pro se*, filed applications for the writ of habeas corpus challenging his convictions on identical grounds, namely, the evidentiary and prosecutorial misconduct claims raised in the state courts. On September 5 and October 31, 2007, respondent filed answers to the two petitions. Respondent contends that petitioner's evidentiary claim is not cognizable on habeas review and that his prosecutorial misconduct claim is procedurally defaulted and without merit.

B.  *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing

11

legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

C.   *Evidentiary Claim (Claim I)*

1.   *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws."). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional

12

magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

    2.    *Analysis*

Petitioner contends that the trial court erred in admitting evidence of (1) the Ean French murder in Kent County, and (2) the guns recovered in his home. This evidence was admitted in both of petitioner's trials. Petitioner contends that the admission of this evidence violated Rule 404(b), which provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the

13

character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material[.]" MICH. R. EVID. 404(b). At a pre-trial hearing, the trial court ruled that the evidence was admissible, concluding that it was relevant to a common scheme or plan and admissible to provide support for Traylor's testimony that petitioner was a "hit man." On appeal, petitioner contended that the evidence was not properly admitted under Rule 404(b) because the possession of the guns and the French murder were not part of a single common scheme or plan and because bolstering a witness's credibility is not a proper purpose for propensity evidence under Rule 404(b). Thus, petitioner argued, the evidence was relevant only to the extent that it showed petitioner's propensity to commit the crime, which rendered it inadmissible under Rule 404(b). Petitioner also argued that the evidence was unfairly prejudicial.

The Michigan Court of Appeals rejected petitioner's arguments, relying on the Michigan Supreme Court's decision in *People v. Starr*, 457 Mich. 490, 577 N.W.2d 673 (1988). In that case, the Supreme Court held that other acts evidence may be properly admitted under Rule 404(b) for the purpose of demonstrating a lack of mistake or fabrication by a testifying witness. *See id.* at 501-02, 577 N.W.2d at 678. Applying this rule, the court of appeals in petitioner's case reasoned:

> In this case, the informant testified that defendant told him that he was stockpiling weapons to use in his new vocation as a "hit man." Defendant also hinted or outright revealed to the informant beforehand his intention to commit the three murders and verified them after they were accomplished. As in *Starr*, the evidence introduced in this case confirmed that the prosecution's key witness did not merely invent the circumstances of the criminal activity. The evidence demonstrated that defendant often accurately bragged of his criminal exploits to the informant, perhaps to recruit him for other murders or merely for personal aggrandizement. As in *Starr*, the exclusion of this evidence would have left an inexplicable gap in the sequence of events that reasonably led the police and prosecutor to give credence to

14

> the witness's incrimination of defendant. This gap would have left the witness vulnerable to disprovable allegations of fabrication. Because this case so closely mirrors *Starr*, we find no abuse of discretion in the trial court's decision to admit the "other acts" evidence.

*Johnigan*, 265 Mich. App. at 466-67, 696 N.W.2d at 727 (footnotes omitted). Because this determination was neither contrary to, nor an unreasonable application of, clearly established federal law, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

As noted above, the issue here is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but rather whether petitioner was denied a fair trial by the introduction of this evidence. This being the case, petitioner is not entitled to habeas relief even if the evidence was not properly admitted under Rule 404(b). Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S. 342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974). And the Supreme Court has expressly declined to answer whether improper admission of other acts evidence solely to show propensity constitutes a due process violation. *See Estelle*, 502 U.S. at 75 n.5. In light of this state of the law, the Michigan Court of Appeals's evidentiary ruling was neither contrary to nor an unreasonable application of clearly established federal law under § 2254(d)(1). *See Alberni v. McDaniel*, 458 F.3d 860, 863-67 (9th Cir. 2006); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Further, the Michigan Court of Appeals's decision in petitioner's case and the Michigan Supreme Court's decision in *Starr* that corroboration to show lack of a witness's fabrication is a proper purpose under Rule 404(b) is consistent with the federal courts' application of the identically

worded Federal Rule of Evidence 404(b). The federal courts have uniformly held that "evidence of other crimes or acts is admissible to corroborate evidence that itself has a legitimate non-propensity purpose." *United States v. Bowie*, 232 F.3d 923, 933 (D.C. Cir. 2000). In other words, "corroboration is . . . an acceptable purpose to admit prior act evidence." *United States v. Oskowitz*, 294 F. Supp. 2d 379, 382 (E.D.N.Y. 2003); *see also*, *United States v. Blakeney*, 942 F.2d 1001, 1019 (6th Cir. 1991); *United States v. Porter*, 881 F.2d 878, 886 (10th Cir. 1989). In short, petitioner cannot show that he was denied a fair trial by the introduction of this other acts evidence, nor can he show that the Michigan Court of Appeals's determination was contrary to, or involved an unreasonable application of, clearly established federal law. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

D.     *Prosecutorial Misconduct (Claim II)*

Petitioner also contends that he was denied a fair trial by the prosecutor's improper and prejudicial comments at his trials. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.     *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the

degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. (internal quotation omitted).

    2.    *Analysis*

For the most part, petitioner's prosecutorial misconduct claim is based on the introduction of the other acts evidence. Petitioner contends that the evidence was improperly admitted and that the prosecutor committed misconduct by extensively arguing that the evidence showed that petitioner was a "hit man." Because the state courts concluded that this evidence was admissible, the prosecutor did not commit misconduct by introducing the evidence or commenting on it during argument. *See Sweet v. Delo*, 125 F.3d 1144, 1154 (8th Cir. 1997); *Hammond v. Michigan Parole Bd.*, No. 04-73385, 2006 WL 2161028, at *16 (E.D. Mich. July 31, 2006) (Roberts, J., adopting Recommendation of Komives, M.J.). As the Sixth Circuit recently explained, "[a] prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings." *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008).

It is true that the prosecutor, in both trials, repeatedly referred to petitioner as a "hit man," and pointed to the evidence of the French murder and the weapons found in petitioner's home to support this assertion. It is equally true, however, that in each case the context of the comments makes it clear that the prosecutor was not asking the jury to convict petitioner of the Moore and Rogers murders simply because petitioner was a "hit man." Rather, the prosecutor was arguing that

17

this evidence supported Traylor's testimony and provided a basis on which the jury could find Traylor credible. As petitioner's brief in the Michigan Court of Appeals, which he attaches in support of his petition, itself states, "Traylor's credibility was the central focus of the 40 or 50 pages of transcripts" comprising the prosecutor's closing argument in the Rogers murder trial.

Petitioner is correct in asserting that the prosecutor used the other acts evidence to bolster Traylor's credibility. He is wrong, however, in arguing that there was anything improper in the prosecutor's doing so. While it is true that a prosecutor may not vouch for the credibility of the witnesses, the prosecutor did not do so in petitioner's cases. Improper vouching occurs either (1) "when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor's office] behind that witness," or (2) through "comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *see also*, *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001).[3] The prosecutor did not express a personal belief in Traylor's credibility or suggest that facts not before the jury rendered Traylor credible. Rather, the prosecutor pointed to the evidence of the French murder and the guns recovered from petitioner's home that was placed before the jury, and argued that this evidence supported Traylor's testimony that petitioner had killed the victim's because he was a "hit man" and had been hired to kill them. This was not improper vouching. *See United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998) ("[W]here a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness is based on his own personal

---

[3]Some cases referring to only the first type of comment as "vouching" and describe the second type of comment as "bolstering." *See Francis*, 170 F.3d at 551.

18

knowledge, the prosecutor is engaging in proper argument and is not vouching."). In short, the prosecutor asked the jury to judge Traylor's credibility on the basis of the evidence admitted at trial, and suggested nothing more than the fact that the other acts evidence supported Traylor's testimony that petitioner was a "hit man" who had been hired to kill Moore and Rogers. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing

party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                                                  s/Paul J. Komives  
                                                  PAUL J. KOMIVES  
Dated: 9/30/09                       UNITED STATES MAGISTRATE JUDGE

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on September 30, 2009.
>
>                         s/Eddrey Butts  
>                         Case Manager